[This cause, and the one next following, viz., The People *v.* Mott, were adjudged at October Term, A.D. 1851, but not reported in the first volume of California Reports. Because of their importance they are inserted here.]

## THE PEOPLE of the State of California, ex relatione S. R. HARRIS, Appellants, *v.* CHARLES D. BRENHAM, Mayor of San Francisco, Respondent.

The act to re-incorporate the City of San Francisco, passed the 15th April, 1851, provides, that the *first* election for city officers should be held on the fourth Monday of April, 1851; and *thereafter annually* at the *general election for State officers.* The general election was appointed by law to be held on the *first Monday in September of each year.* At the first election for city officers, held on the fourth Monday of April, as above directed, the respondent was elected mayor of the city, was qualified, and was in the exercise of the functions of his office. At the general election held on the first Monday of September following, the relator received 1101 votes for mayor (the whole number given), was qualified, and claimed the office of the respondent on the 24th of the same month. No notice of the latter election was given, or other measure pursued, by the city council, under the 4th section of the 2d article of the charter. The respondent refused to surrender the office, and the relator filed this bill asserting his right to it, &c.

Held, that the election of the relator was valid, and that the means of bringing about the election and the irregularities therein should be disregarded.

It is not important to interpret the literal meaning of the word *annually* or the word *or,* as used in the city charter of 1851, respecting the election of municipal officers; the actual and substantial intention of the legislature is to be sought after.

The best rule of interpretation of the statute in question, is to follow the established policy of the government from its origin, which is, to make elective all officers of the state, counties, and cities, at the shortest period which the convenience of the public will permit.

Official terms should not be extended beyond the time clearly defined, but rather shortened by implication, if necessary.

Appeal from the Fourth Judicial District.

This action was brought by the plaintiff, by their attorney-general, upon the complaint of Stephen R. Harris, against the defendant, and avers that defendant is now, and has been since the 3d September, 1851, unlawfully holding and exercising the office of mayor of the City of San Francisco. That said Harris was, on the 3d September aforesaid, duly elected to fill the said office, and is now entitled to hold and occupy the same, and had qualified as required by law; and had demanded of defendant the said office, with the books, papers, &c., who had refused to yield the same, &c., to the great injury and prejudice of the people of the State and of said Harris, and prays that said Brenham may be ousted from said office, and that said Harris may be declared the lawful incumbent, and invested with the authority and duties thereof, &c.

The defendant denied all the allegations of the complaint, and prayed to be dismissed; and for his costs, &c.

The case exhibits the following facts :—

The City of San Francisco, was first incorporated by law on the 15th April, 1850. The act of incorporation provided that the municipal officers should be elected on the fourth Monday of April in each year.

On the 15th day of April, 1851, an act was passed which repealed the above act, and re-incorporated the city. By the last act it is provided that the first election for officers of the city should be held on the fourth Monday of April, 1851, and *thereafter annually* at the general election for state officers.

The election for state officers is appointed by law to be held on the first Monday in September of each year.

At the charter election held on the fourth Monday of April, 1851, the defendant was elected mayor, was duly qualified, and went into the possession of the office, and the discharge of his duties.

At the general election for state officers held on the first Monday in September following, a portion of the qualified voters of the said city claimed the right to vote, and did vote for the municipal officers provided for in the act of 15th April, 1851, rechartering the said city.

The entire number of votes so cast for mayor was 1101, all of which were given to the relator.

On the 20th of September, 1851, the Clerk of the County of San Francisco issued his certificate to the relator, certifying his election, who, on the 22d September, took the oath of office as required by law.

On the 24th September, 1851, the relator demanded of defendant the said office, books, papers, &c., who claimed the same in virtue of his election and qualification, as above stated, and still claims the same, and holds and exercises the functions thereof, and who refused to accede to the demand of the relator, and still refuses.

It was admitted that defendant was duly elected at the said charter election, held on the fourth Monday of April, and was duly qualified.

And it was also admitted that no election had been called by the common council of the city in September, 1851, nor any notice given of such election by the said common council, as required by the city charter in relation to charter elections.

The words of the Act of 1851, bearing upon the question in dispute, are as follows :—

Sect. 1 of Art. II.—" For the government of said city there shall be elected annually, by general ticket, the following officers: a mayor," &c.

Sect. 5 of the same article.—" The first general election for officers under this charter shall be held on the fourth Monday of April, 1851, and thereafter annually, at the general election for state officers."

Sect. 16, Art. IV.—" The officers elected under this charter shall continue in office for one year, or until their successors are qualified."

After hearing the case, the District Judge decided as follows:—

The complaint in this case alleges in substance that the defendant is now, and since the third day of September last has been, unlawfully holding the office of Mayor of the City of San Francisco, to which office the relator, Stephen R. Harris, was on that day duly elected, and prays that the defendant may be ousted from said office, and that the relator may be declared

the lawful incumbent, and invested with the authority and duties appertaining thereto.

The agreed case upon which the cause is presented, states :—

1. That at the general election, on the third day of September, 1851, the polls were regularly opened in all the wards of the City of San Francisco, under the general election law.

2. That a portion of the qualified voters of the city claimed the right to vote for the municipal officers, provided for in the charter.

3. That the entire number of votes, so cast for the office of Mayor, was eleven hundred and one, all of which were cast for Stephen R. Harris, the relator.

4. That on the 20th of September, the Clerk of the County of San Francisco counted the votes, and issued a certificate to the said Harris, certifying his election to the office of mayor, and that, on the 22d day of September, said Harris qualified, by taking the oath of office.

The facts then being thus admitted, the questions to be considered arise upon the construction of the act, re-incorporating the City of San Francisco, passed on the 15th day of April, 1851.

It was conceded in the argument, that the omission by the common council to order the election, and to give public notice thereof, would not of itself vitiate the election.

I have no doubt of the correctness of this proposition. The popular will cannot be defeated by such a neglect, whether wilful or accidental, on the part of the common council; especially when the time and place of holding the election have been already fixed by law.

But it is by no means clear, that such order and notice are required at all.

The fifth section of the second article of the charter provides, that "the first general election for officers, under this charter, shall be held on the fourth Monday in April, 1851, and thereafter *annually*, at the *general election* of *state officers*."

The third section of the same article provides, that "all vacancies, except as hereinafter provided, shall be filled by election, in such manner as may be prescribed by ordinance," and

by the fourth section it is made "the duty of the Common
Council, to call all city elections, to designate the place of hold-
ing the same, giving at least ten days' notice thereof, to appoint
inspectors of election, to examine the returns, and declare the
results, and to determine contested elections."

I am inclined to the opinion, that the duty of the Common
Council, as prescribed in section four, was only intended to
apply to such special elections as are prescribed by section three,
and to the first general election, which took place on the fourth
day of April last.   Because the law has fixed the *time and place*
for the election of city officers in future, to be at the *general elec-
tion* of state officers; and it seems to me, that the legislature,
in thus fixing the time and place, clearly intended to incorporate
the state, county, and city elections, into one general election,
with one board of judges, who should be authorized to receive
the votes for all officers, to be chosen at such election.

If, therefore, under the Charter, there should have been an
election for the office of mayor at the last general election, then
the relator is legally elected to that office.

Much of the embarrassment in this case has arisen from its
having been assumed, by both parties, that the term of office of
the mayor elected in April last, would, in any event, be a frac-
tion of a year, the relator insisting that such term continued
only till the general election, which took place in September last,
whilst the defendant contends, that he is lawfully entitled to hold
the office for the full term of the year, from the time of his elec-
tion.

Such, indeed, is the conclusion at which I have arrived.   It
will be observed that there is no precise time fixed by the Charter
for the commencement or termination of the official year; but
from the provision for holding the first election in April last, al-
ready referred to, taken in connection with section 16, of article
4, which provides, "that the officers elected under this Charter
shall continue in office for one year, or until their successors are
qualified," it may be fairly inferred, that the official year here-
after, under this Charter, should terminate on the fourth Monday
of April, and that the officers to be elected at each general elec-
tion in September should enter upon the duties of their offices
31

on the fourth Monday of April, and that the officers to be elected at each general election in September should enter upon the duties of their offices on the fourth Monday of April following.

The language used in section 2, of art. 3, " that both boards shall assemble on the first Monday after their election," taken in connection with the several other provisions already referred to, can only be interpreted to mean, that they are to meet on the first Monday after the term for which they shall have been elected shall commence.

It is only by such a construction that complete effect can be given to the whole Charter ; and it produces less conflict than any other construction that can be given it.

It follows, therefore, that the defendant is legally entitled to hold the office of mayor until the fourth Monday of April, 1852, at which time the relator's term of office will commence.

In accordance with this opinion the District Court ordered judgment to be entered for the defendant, from which plaintiffs appealed.

——, for appellants.

The Charter provided for an election of municipal officers at the general election in September last.

Section 5, art. 2, of the Charter of 1851, provides, that the first general election for officers shall be held on the 4th Monday of April, 1851, and *thereafter annually*, at the general election for state officers.

Here are two distinct provisions, the first for an immediate election, the other for a series of annual elections. The term " annually" does not relate to the first provision for an election in April ; but *thereafter*, the election shall be had at the general election for state officers annually. In ascertaining the first term, therefore, " annually" may be omitted in the section, which would then read, " the first election, &c., shall be held on the fourth Monday of April, 1851, and thereafter at the general election for state officers."

The provision, sect. 16, art. 4, that the officers elected, &c., shall continue in office one year, or until their successors are qualified, shows the understanding of the legislature, that the first term was not for a year.

The journals of the House and Senate show, that a bill passed the House, and was lost in the Senate, where the bill originated, to extend the term from September, 1851, to September, 1852. If the meaning of the section be doubtful, this " cotemporary exposition" ascertains it, and shows that it was well understood, that the term ended in September, and also, that the Senate refused to extend it.   3 How. 564, 565 ; 1 Black. 60.

No order of the Council was necessary.   The election was provided for by law ; the time, place, and inspectors of the general elections were provided for, and after the first election, the municipal officers were directed to be elected at the general election, that is, at the same time, place, &c., and by the same machinery.   The Council, therefore, could not supply time, place, or inspectors, and so much of  section  fourth of the Charter as provides for the appointment of time, place, &c., in relation to elections by the Council, must be held to apply to such special city elections as may occur under other sections of the  Charter, filling vacancies, &c.   See Charter, art. 2.

But if the 4th sect., art. 2, should be held to apply in these respects, it is merely *directory*.   Rex *v.* Locksdale, 1 Burr. 447, per MANSFIELD, Justice.   " There is a known distinction between things which are of the essence of the act to be done, and things which are not."   See Smith's Stats., 679, 680, 681, 673 ; 7 Hill, 9 ; 12 Wend. 486 ; 11 Ib. 605 ; Smith, 671 ; 2 Watts, 9 ; 8 Vern. 280, 390.

If these provisions are not advisory, then the Governor may defeat any state election—the County Judge may defeat any county election.   Either may secure a continuation of office, and defeat the popular will.

The *election* determines the rights of the person elected. Rex *v.* Vice-Chancellor of Cambridge, 3 Burr, 1647–9 ; Ex- parte Hiatt et al., 3 Hill, 43, 47.

The term commences on the first Monday after the election. See art. 3, p. 1, of the Charter.

*M'Lean* and *Norton*, for respondent.

By the Charter, the general elections are to be annual, and

the one for 1851, was fixed for the fourth Monday of April. Charter, 1851, art. 2, sect. 15 ; art. 4, sect. 16.

This is in conformity to the policy of this state, and of all others in relation to municipal elections. Smith's Com. 740, sect. 622 ; Char. 1850, p. 224, sect. 4 ; p. 226, sect. 19.

See also the general laws for incorporating cities and towns, and other special incorporations. Laws of 1850, 91, sect. 32, p. 128; sect. 2, p. 73 ; sect. 21, p. 121; sect. 8, p. 124; sect. 21, p. 127 ; sect. 21, p. 134; sect. 31.

Departure from this general policy was not intended. 6 Barbour, 60.

The construction which would give two elections in the year 1851, would occasion great collision between the various provisions of the Charter. Char. of 1851, art. 2, sect. 1; art. 4, sect. 16.

The word " or," in sect. 16, art. 4, is synonymous with the word, and, and is so used in the legislation of this state. Laws of 1850, p. 124; sect. 21, p. 127 ; sect. 21, p. 134; sect. 2, p. 85; sect. 1, p. 163; sect. 3, p. 226; sect. 19. Smith's Com. 751, sect. 637.

The Constitution giving one election in 1851, renders all the provisions of the Charter harmonious, and gives effect to every word in its natural meaning, and in the order and place in which it occurs. Smith's Com. 588, sect. 419 ; Ib. 672, and 651, sect. 508 ; Ib. 619, sect. 465–6; Ib. 603, sect. 442.

The ordinary meaning of the word "annually" in statutes, is not a measure of time, but successive calendar years. Const. California, art. 4, sect. 3 ; Laws of 1850, 64, sect. 13 ; Laws of United States, vol. 1, 73, sect. 1 ; Revised Stats. of Mass., part 1, ch. 15, sects. 17, 18, 20–36; ch. 11, sect. 5; ch. 13, sect. 40.

The word "annually," in sect. 5, is, by the word "thereafter," connected with, and refers to, the election of April, 1851. Revised Stats. of Mass. 101, sect. 3 ; Ib. 127, sect. 20; Smith's Com. 711, sect. 576; Sacramento City, Laws of 1850, p. 73, sect. 21, p. 79 ; sect. 2.

The word "first," in sect. 5, establishes the election of April, 1850, as one of the annual elections. See provisions of other

statutes; Charter of 1851, art. 2, sect. 128; Laws of 1850, 206, sect. 15, p. 81; sect. 123; Law Concerning Offices, 1851, sect. 14.

The absence of any express or incidental provision, indicating a contrary understanding by the legislature, is controlling in favor of defendant's construction.  Laws of 1850, 91, sect. 31, 32, p. 128; sect. 2, p. 123–4; sect. 20 and 21, p. 124; sect. 21, p. 134; sect. 20, 21, p. 97; sect. 2, p. 73; sect. 21.

No election was held in September, 1851.  The Common Council did not call or notify an election: Char. 1851, sect. 4, art. 2; 5 Burr, 2681; 1 Adol. and Ellis, 878; Revised Stats. of Mass. 8, 1 ch. 15, sects. 8, 17, 18; 6 Mit. 340; Laws of 1850, 91, sect. 32.

The day being fixed by the statute does not affect the case.  2 Kent's Com. 295; Cowper, 538; Election Law of 1850, 101, sect. 5 and 8.

The argument *ex necessitate*, has no application, as there is an effectual remedy by mandamus.  1 Barn. and Cress. 310; 4 Burr, 2011; 8 East, 270; 6 T. R. 301; Prac. Act, 1851, title 12, ch. 2.

If the action of the Common Council could be dispensed with, still what transpired was not an election.  Charter, 1851, sect. 4, 57; Election Laws of 1850, p. 102, sect. 17; General City Incorporation Law, 1850, p. 91, sect. 32.

If the relator was elected in September, he did not qualify within the time required by law.  Charter of 1851, art. 4, sect. 15; 20 Wend. 12; 1 Revised Stats. of New York, 122, sect. 34; 9 New Hamp. 524.

If relator was duly elected, and duly qualified, his term of office does not commence until the fourth Monday of April next. Law Concerning Offices, 1851.

Chief Justice HASTINGS delivered the opinion of the court. MURRAY, Justice, concurred with the Chief Justice in his conclusion, but for different reasons, and delivered his opinion in conformity to his views.  LYONS, Justice, dissented.

HASTINGS, Chief Justice.  Three propositions are suggested

relating to the construction of the Charter of the City of San Francisco, regulating the election and terms of the officers of the city.

1. That the election should have been holden in September, 1851, and the terms of the officers to commence in April, 1852.

2. That the first election having been holden on the first Monday of April, A. D. 1851, the second election should be postponed until the September general election, 1852.

3. That the term of the respondent should cease at the state election of September, A. D. 1851, and that the election of the relator, as his successor, was legally holden at that time.

One of these propositions must be adopted, and we shall adopt that which would naturally produce the least injury, and best harmonize with the intention of the legislature, and the general policy of the State Government, relating to the terms and tenure of office.

The first proposition violates section 2, article 4, of the Charter, which provides that both boards (of aldermen) shall assemble on the first Monday after their election, and would operate an injury to the public in this, that they would be deprived of the services of officers, who would usually be elected for causes influencing the minds of the electors at the time, which might not exist months after, and a wrong upon the officers elect, by postponing the commencement of their terms, until the first Monday of April, of each year.

The second proposition is obnoxious to the 16th section of article 4, which provides that the officers elective under this Charter shall continue in office for one year, or until their successors are qualified, as it gives the respondent a term of seventeen months, a greater term than any of his successors could be elected to.   This is not usual in the incipient organization of any city government, and such a term is not contemplated and prescribed by the Charter.

By adopting the third proposition, it is difficult to perceive how the public can suffer further injury, than a change of officers may produce, during the prosperous administration of the affairs of the city; and this could be of no great moment, provided competent successors are elected.   It is true that this construction seems to conflict with the 16th sect. referred to, and the

general policy of the Charter, which contemplates a term of one year, and but one general election for each year, and curtails the term of the respondent to a half year ; but the term of one year is not absolute.   It may be limited by an event which may happen, viz.: the election and qualification of a successor, prior to the termination of the term.   It is not of much importance to interpret the literal meaning of the word *annually*, or of the. word *or ;* the actual and substantial meaning and intention of the legislature is to be sought after, and we know of no better rule than to follow the established policy of the State Government, from its origin, which evidently is to make elective all offices of the state, counties, and cities, at the shortest periods which the convenience of the public will permit.

Governed by this policy, we should not extend official terms beyond the time clearly defined, but rather by implication, if necessary, shorten the duration of a term, than prolong it.

Adopting the third proposition, the first official year in the government of the City of San Francisco should have closed at the September general election, for 1851, and the second official year should have thereupon commenced.

This would give the respondent a fraction of a year for his term, and not one full term and a fraction of a second.

As to the validity of the election of the relator, we are of the opinion that the decision of the court below is correct.   He received a majority of all the votes cast, at an election ordered by law; and the means of bringing about the election, and irregularities therein, should be disregarded, as it is to be presumed that all of the electors knew the law, and were not prevented from voting by any fraud or misconduct on the part of those who conducted and managed the election.   The time and place of the election being fixed by law, it may have been the duty of the Common Council to give notice thereof; and should they fail to do so, or to perform any other duty required, prior to the election, a writ of mandamus might issue from the courts commanding them to discharge their duty ; but this would not afford immediate relief; and it ought not to be in the power of incumbents in office to prevent the election of their successors, at the time and place prescribed by law, by neglect on their part.

Unless the election of the relator is a nullity, he acquired a right to the office, which should be protected. So much, therefore, of the judgment of the court below declaring the election of the relator to be valid is affirmed, and that part of the decision of the court postponing the commencement of the term until the first Monday of April, 1852, is reversed, and the District Court is ordered to enter judgment in this case accordingly.

MURRAY, Justice. Although I concur with the conclusions of the Chief Justice, I have been led to them by a somewhat different train of reasoning, and desire to state my views upon the questions arising in this case.

The only points of any importance for our decision are, 1st, does the City Charter provide for an election for city officers to be held in September, 1851, at the general election for state officers? And 2d, if such an election was contemplated and provided for, was the election of the relator valid and sufficient? Those portions of the Charter which relate to the time of elections and the term of office, are sect. 1st, art. 2d, which provides, that "there shall be elected annually, by general ticket, a mayor," &c. Sect. 16 art. 4: "The officers elected under this Charter, shall continue in office for one year, or until their successors are elected and qualified." And sect. 5, art. 2: "The first general election under this Charter for city officers, shall be held on the fourth Monday of April, 1851, and thereafter annually, at the general election for state officers." Upon the construction of this section turns the whole case. To me the plain and obvious meaning of this section is, that there shall be an election for city officers, at the general election for state officers, in each year, commencing with the election of 1851.

There is no difference of opinion as to the signification of the word *annually*, it being conceded that it does not mean a measure of time, but a succession of calendar years. For the purpose of giving effect and operation to the new Charter as speedily as possible, an election was provided for the fourth Monday of April, 1851; and thereafter, elections are to be holden annually (or in each year), at the general election for state officers. The word annually does not relate to the first election of April, so as to make it one of the annual elections contemplated

by the Charter. There are two distinct provisions in the section, one providing for an immediate election, so as to give vitality to the Charter; and the other, *thereafter*, for a series of annual elections, to be held at the time of the general election. The first general election, after the election of April, 1851, was the election of September, 1851, at which time city officers were required to be chosen, and no conflict of the provisions of the Charter arises from this construction.

On the other hand, it is contended that the election of April was the first of a series of annual elections provided by the Charter, and that the second election should not have been held until 1852. It is said that it is the uniform policy of the legislature of this state, as well as of other states, to create annual terms for municipal officers; and that a provision of law, requiring two elections in one year, would be a wide departure from this settled policy, resulting in great loss and inconvenience to the public. I have been unable to find any such policy expressed in the acts of our legislature, and as far as anything can be inferred from the acts themselves, it is apparent that the legislature has endeavored to limit the terms of all officers to as short a period as possible. At least, the fact that the legislature has in most instances fixed the term of our municipal officers for one year, does not prove, or raise the presumption, on a fair construction, that they did not in this instance intend to limit the first term to five months. In fact, the unsettled and uncertain state of things, together with the history of municipal corporations in this state, raise the inference that the legislature may have regarded the inconvenience of frequent elections as inconsiderable, compared with the benefits to be attained.

Neither can the case cited of the Charter of Sacramento City be used to sustain the construction contended for by the appellees. The Charter provides that the first election shall be held on the first Monday of April, 1850, and after the first election, elections shall be held in May of each year. This would require all municipal officers to be again elected in one month. This was a mistake of the legislature, and unless corrected would have led to great trouble and dispute; but I do not see how an error of this kind can be considered as a precedent settling the legisla-

tive construction of this case; but, on examination, I find that the legislature passed a separate act, correcting that mistake, and continuing the term of office until May, 1851; so that if the case prove anything, it is, that the legislature, in a case similar to our own, thought it a matter of sufficient importance to correct, by a separate act, that which they knew to be a mistake.

But considering that the construction of this section is doubtful, there is no better way of arriving at the intention of the legislature than by consulting the legislative history of the bill.    After the passage of the Charter, a bill was introduced, and passed the House, so amending the *fifth section of the 2d article* that the second election should be held in 1852.    This bill was indefinitely postponed in the Senate.    What is the necessary inference? Can it be, as contended by the appellees, that the matter was so plain as to need no explanations, and therefore the Senate refused to concur.    Nothing is more common in legislation than amendatory and declaratory acts.    If there were such grave doubts in the House, as to the meaning of this section, why should the Senate, where the bill originated, if they had understood its meaning to be the same as that given by the House, have refused to concur, and rectify the mistake, if one existed? More especially, as the legislature had, on a former occasion, and in a similar instance, viz., that of Sacramento City, deemed it of sufficient importance to correct a mistake by a declaratory act. To my mind, the conclusion is inevitable, that the Senate understood that the first term of office extended only to a period of five months, that the Charter contemplated an election in September, 1851, and that they were unwilling to alter it.    If, however; I am mistaken in my deductions from this action of the legislature, I hold it to be a proper and necessary rule of construction, that whenever there is a question whether the people have parted with a particular right, and the question cannot be clearly determined from the grant of power itself, the intendment of law must be in favor of popular rights; and this rule, if a proper one, settles the first part in favor of the relator.

If, then, the election for city officers should have been held at the general election in September, 1851, let us inquire if the election of the relator was sufficient.    Upon examination it is

apparent that the legislature designed, as far as possible, to consolidate all elections, state, county, and city, into one. Section 6, art. 3, of the Charter, provides, that all provisions of law regulating elections for state officers, shall apply, so far as practicable, to elections under this Charter.   The general election law provides the time, place, and inspectors for the election.   The Common Council have no right to alter the time, place, and inspectors, so provided under the general election law, and their authority under the 4th sect. of 2d art. of the Charter to designate the place, appoint the inspectors, &c., can only relate to elections to fill vacancies, and such special elections as the law may direct.

But it is contended that there was no notice given by the Common Council, as directed by sect. 4, art. 2; and many authorities are cited to show that this is a duty incident to corporations, and necessary to be performed, in order to give validity to the election.   There is a wide difference between the cases cited and the one at bar.   Here, all the machinery of an election was provided,—time, place, and inspectors.   The case of the election by the Council was not of the essence or substance of the election, not something that must be done, but merely directory; and no neglect of their officers to perform a mere ministerial act would defeat the right of the people to elect their agents or officers. If a different rule should be holden, then the Governor, by refusing to issue his proclamation, or the Council, by refusing to give the notice required by law, might continue themselves in office beyond the term for which they were elected.

It is said, however, that the proper remedy would have been by mandamus, to compel the Common Council to call the election.   It is made the duty of the Council to give ten days' notice of the elections.   No court could presume that the Council would neglect a duty imposed by law.   A mandamus could not have issued until the time of calling the election would have gone by; so that if there is anything in the argument, it would have been useless and unnecessary.   It has long been a settled rule of law and practice of courts to sustain elections held in good faith, where there is no complaint of surprise, mistake, or fraud.   In this case, all the substantial requirements of law have been complied with, and no fraud is alleged or proved.   It is hardly neces-

sary to say, that the court cannot regard the number of votes cast; the right of one man to exercise the privilege of a vote is as absolute and undeniable as that of thousands, and he is entitled to the results arising from the exercise of that right, whether the community at large think proper to participate with him or not.

By this election, the rights of the parties were determined, and it is not in our power to disturb them.

In relation to the failure of the relator to qualify within ten days after the election, I do not understand that there is any authority whatever to show, that this necessarily vacates the office; this provision of the Charter is merely directory, and has always been held as such by other courts; besides, the inspectors have ten days in which to make their return; the agreed case shows that the relator qualified within ten days after the return, which is all that the law could possibly require.   Section 2, art. 3, requires both boards of aldermen to assemble on the first Monday after their election, and fixes the time when the term of the officer elected shall commence.   Upon these considerations, I am of opinion that the second election under the Charter should have been holden at the general election for state officers in September, 1851, that the relator was properly elected in September last, and that the term of his office commenced upon the Monday following said election.

LYONS, Justice.  This action is brought to determine the right of the relator, Harris, to the office of Mayor of the City of San Francisco.  No question is made as to the right of the defendant to hold the office by virtue of his election in April, 1851, until a successor has been duly elected and qualified, and the decision of this case therefore depends upon the right of the relator as such successor. In behalf of the relator it is claimed, that the defendant's term of office expired on the third day of September last, and that on that day the relator was duly elected as his successor.

The City of San Francisco was first incorporated by a law passed on the 15th day of April, 1850, which provided, that the officers should be elected on the fourth Monday of April in each year.   On the 15th day of April, 1851, a new act of incorporation was passed, and the former Charter repealed.   By the new

Charter, it is provided that the officers "shall be chosen annually," and that the first election shall be held on the fourth Monday of April, 1851, and thereafter annually, at the general election for state officers.   The election for state officers is appointed by law to be held on the first Monday of September of each year ; and the first and principal question to be decided is, whether the provisions of the new act of incorporation required two elections for city officers to be held in the year 1851,—the first on the fourth Monday of April, and the second on the first Monday of September; or whether it provided but for one election in that year, and for the subsequent annual elections to be held on a different day of the year.   There are but three sections of the Charter bearing directly upon the subject.   Sec. 1, of art. 2, is as follows : " For the government of said city, there shall be elected annually, by general ticket, the following officers : a mayor," &c.   Sec. 15th of the same article is in these words : " The first general election for officers under this Charter shall be held on the fourth Monday of April, 1851, and thereafter annually, at the general election for state officers.   No election shall be held in any place where intoxicating liquors are vended." Section 15th of art. 4th, runs thus : " The officers elected under this Charter shall continue in office for one year, or, until their successors are qualified," &c.   The obvious meaning of these provisions, as they appear to my mind is, that the general elections under the Charter are to be held once in each year,—the one for 1851, in the month of April, and those for subsequent years at the time of the general state election.   But it is urged for the relator that the word " annually" does not determine the second election to be in the year after the first, because the day of the second election would not be exactly a year after the first. This would be so if we consider the word annually as having no other signification than the recurrence of periods exactly one year apart.   I do not understand that to be the meaning of the word.   If it were, the provisions of the Charter are utterly irreconcilable, for an election held in September, either in the same year with the April election, or the year thereafter, would not be annual in that sense.   We should therefore be obliged to construe this section as if this word was not in it, and the utmost

result would be, that the section *might* so be read as to *allow* of the second election in the same year, provided such an intention is expressed, or could fairly be inferred, from other parts of the Charter. But no such intention is elsewhere to be found; on the contrary, both the other sections that have any bearing upon the subject, are directly adverse to the intent sought, and they must both be deprived of their natural meaning and effect to allow of such construction of the fifth section.

By section 1, of article 2, the elections are to be annual; by section 5, the April election of 1851, is designated as the first of these elections; by section 16, the officers are to hold for one year, or until their successors are qualified; and nowhere in the Charter is there the slightest intimation that the elections are to be *oftener* than once a year, either in 1851, or any other year, unless it be found in the possible construction of the section which we have now considered.

The suggestion that the word " *or*," in section 16, indicated that the officers might be elected for less than one year, is without force, as it appears to have been copied from the former Charter, in respect to which no such suggestion could apply, and the same word is used by the legislature, in various other acts of incorporation, as synonymous, in similar provisions, with the word " *and*." But there is no occasion for construing the word " *annually*" out of section fifth. A very common, indeed the most usual, meaning of this word in statutes, is to designate the succession of calendar years, and not the exact period of a solar year. An example may be found in the Constitution of this State : Art. IV., Sec. 3, provides that the members of Assembly shall be chosen annually; yet the day, as we know, after having been once fixed by the legislature, and elections held accordingly, was, before the recurring date, changed to another day. Again, by a law passed in 1850 (chap. 16, sect. 13), it is enacted " that there shall be paid annually out of the general fund, to the order of the government, a sum not exceeding five thousand dollars, to defray the contingent expenses of administering the government of the state. It will not be assumed that if the money thus appropriated be drawn from the treasury at other than the regularly recurring periods of twelve months,

the law will be violated. By section 17, chapter 15, of the Revised Statutes of Massachusetts, it is enacted, " that the annual town elections shall be held in the month of March or April," the particular day of either of these months to be fixed by the warrant of the selectmen in each year.

These are instances in which the words annual and annually are employed to designate successive calendar years, in cases where at the same time it is contemplated that the particular periods of the year will vary. Moreover, in the section under consideration, the word "annually" is connected by the word " thereafter" with the preceding election in April. The provision is not that there shall be an election in September and thereafter annually, but in April and thereafter annually.

For the relator it is further said, that a difference may be perceived between expressions in which the word " annually" should precede or follow the word 'thereafter,' that is, that after mentioning the election for April, 1851, the legislature, by saying "they shall be held ' *thereafter*' annually at the general state elections," separated the word "annually" from " April, 1851," and intended something different from what would have been expressed, had the words been "in April, 1851, and annually thereafter; at the state general elections." On the other hand, it is said for the defendants, that the word " annually" in the section quoted, in order to sustain the views of the relator, should grammatically have been connected in one phrase with the succeeding words, so as to read, "thereafter annually at the general state election," &c., whereas it is separated by the punctuation, standing by itself, as if thrown in, expressly to prohibit the holding of another election in the same year with the one already fixed for the month of April. Having the mind preoccupied with the purpose of discovering a particular meaning, it may be possible to catch from these particulars the shadow of such an intent, as the respective parties seem to perceive, but it is quite too unsubstantial to form the basis of a judicial decision.

In interpreting statutes, "it is the duty of the judge to give effect to the expressed sense or words of the law, in the order in which they are found in the act, and according to their fair and ordinary import and understanding." (Smith's Com. 588.)

The words in section 5 have an ordinary import and understanding in the order in which they are found in the act, and the plain intendment of the enactment is, in my opinion, that the first election should take place in April, 1851, and in each year after 1851, at the general state election.

If any doubt remained as to the propriety of this construction, it would be removed by the legislative construction given to a similar provision in the Charter of the City of Sacramento. The construction claimed by the relator is, that after the election in April, 1851, the elections are to take place *in each year* at the time of the general election, and that the first of such subsequent elections must be held the first time a general state election occurs, such general election having been fixed by law for September in the same year. By the Charter of Sacramento City it is provided that the first election should take place on the first Monday of April, 1850, and that after the first, the elections should be held on the first Monday of May *in each year*, by which, according to the construction claimed by the relator, a second election would be required in one month after the first. But the provisions of the same Charter, that other officers elected in April, 1850, should hold office until May, 1851, show clearly that the legislature understood the law differently.

Looking beyond the law itself, to find an interpretation of its meaning from the motive and consequences of its provisions, the one side insists that a postponement of the election would defer, for a period, the exercise of the important right of the people to change and select their agents, and therefore the court should incline against such construction; the other side urges, that the occurrence of elections for all the officers of a city twice in one year, is unprecedented, and that such a requirement of the law is not to be inferred from a *possible* construction of one of its sections, but should have been clearly and distinctly expressed. If this were a case in which it became necessary to seek outside the law itself for a guide to its meaning, I should have no hesitation in adopting the latter of these constructions. A provision of law which should require all the officers of the municipal corporation, such as the City of San Francisco, to be elected twice in the same year, and at periods less than five months apart,

would certainly be a wide departure from the system of legislation in like cases in this State, and it is believed in all other States of the Union.   The attention of the court has not been drawn to any such instances.   Such a law might occasion, and would certainly contemplate, a change not only of the officers directly elevated by the people, but of all the other appointees of the corporation; so that all the agents employed in administering the important and multifarious affairs of a great commercial city, would be changed, after a term of service scarcely long enough to make them familiar with the duties of their employment.   With the change of men, would follow a change of measures, and the evils usually attendant upon instability and fluctuation in public concerns.   On the other hand, a simple change of the day of the year, upon which an annual election shall be held, is a matter of comparatively little moment, and instances of such change are of frequent occurrence in legislation.

At the date of the passage of the new Charter (April 15th, 1851), the day of the annual state election was fixed by law for the first Monday of October, but on the 26th of April, the day was changed to the first Monday of September.   It does not appear that there was any direct purpose to require two elections in one year, nor was there any important public object to be effected by so doing; and it is only to be inferred from the policy of the legislature, which seems to have been to diminish the frequency of election days, by requiring the local elections, heretofore held in the spring, to be hereafter held at the general state election in the fall, and in carrying out this policy, two elections in the first year was a consequence incidentally resulting from the change of election days.   But the object sought to be accomplished would be effected without resorting to any such unusual measure, by simply deferring the day from the fourth Monday of April, 1851, to the first Monday of September, 1852.   This would, it is true, extend the time of the officers elected on the first-named day, a little more than four months, a circumstance attended by no derangement of the public affairs, nor, as it would seem, affecting them materially in any respect;

33

as those officers would be elected with reference to such extended term. No privilege or right of the electors would be taken away, or curtailed. Their right under the established policy, is to select their agents once in each year, and that right is not taken away or diminished in value, by directing it to be exercised at a different season of the year. In short, the construction of the new Charter, as contended for by the relator, would occasion an unusual deviation from the established line of public policy, possibly producing serious derangement and injury to the public interests, and for no adequate object.

It was further shown to the court on the argument, by the concurrence of counsel for both parties, that eight days after the passage of the new Charter, and five days before the first election under it, a law was introduced into the Assembly, amending section five, by inserting a proviso, " that the second election should not be held until 1852," which law passed through all the various stages of legislation in the lower house, and was sent to the Senate the same day; on the third day thereafter, its consideration in the latter body was indefinitely postponed. On one side it is insisted that this was an attempt to procure an alteration of the law, which failed in the Senate; whilst the other maintain that it was intended as simply an explanatory provision, introduced before any election had been held, in order to obviate the possibility of any question arising after the election should have been decided. I think the latter the obvious signification of this proceeding. The manner of its passing the House, shows that it must have been by the general concurrence of the whole body; and I cannot imagine that the same legislators who had so recently passed a law providing for a second election within about four months of the former, if such is the construction, should in such a manner pass a law, postponing the second election sixteen months from the former. The only proper inference to be drawn from the action of the Senate is, that the law was considered sufficiently explicit without the amendment. It is not to be supposed of a legislative body, that it would purposely leave a law in a condition to give rise to controversy and litigation as to its meaning, and it would be an extravagant supposition, that

the House had originally intended a different, and so widely a different purpose, as to the time of the two elections, and without understanding each other's meaning.

This, however, is not a case in which it is allowable to look elsewhere than at the law itself to ascertain its meaning.   It is a first principle of law upon this subject, that if the words of a law, express clearly the sense and intention of the law, we must hold to that.   Smith's Com. 219   In this case, I think the sense and intention of the law are clearly expressed in its words, and that the second election was provided to take place at the general election for state officers, in the year 1852.

The majority of the court not entertaining these views, the other controverted points may be examined.   First, granting that an election may have been held, was there such an election actually held, according to law ?   Sect. 4, Art. 11, of Charter, makes it the duty of the Common Council " to call *all* city elections, to designate the place of holding the same, giving at least ten days' notice thereof, to appoint inspectors of elections, to examine the returns, and decide the results," &c.   In this case the Common Council omitted to perform the duty assigned them ; no call or notice that an election would be held, was published, no inspectors appointed, no place designated.   The authority to hold election sunder the Charter, has its source in the call by the Council ; the circumstance of a day having been designated in the Charter, of itself determines nothing—the words are simply directory.   2d Kent's Com. 2097.   The electors look to the call of the Council, as the only evidence that an election is to take place ; and the holding of an election without such notice, would have the effect to entrap the corporators into an omission to exercise their rights ; and such was its manifest effect in this instance, it being conceded that not more than one-fifth of the legal voters cast their ballots for the municipal officers, although they were in attendance at the polls, and voted for state and county officers.   I think there is no force in the argument, that the Common Council might, by refusing to publish the call for an election, maintain themselves in office longer than the term for which they were elected.   The law affords an effectual

remedy against such usurpation, and the courts do not hesitate to interpose their authority. Rex v. Mayor of Norwich, 1 Barn. & Cress. 310; Rex v. Cambridge, 4 Burr. 211; Rex v. Thitford & East, 270; Rex v. Mayor of Grampond, 6 S. R. 301; Practice Act, tit. 12, chap. 2.

I think the failure to comply with the requirements of the Charter, fatal to the validity of relator's election.

But if this call of the Council could be dispensed with, still it was indispensably necessary, that inspectors of election duly qualified, authorized to receive votes, administer oaths, and determine the qualifications of voters, should have been appointed. No such inspectors were appointed, either by the Common Council, or the direct action of the people on the day of election, according to the provisions of law. Whence did the county inspectors, who undertook to receive and count the votes for municipal officers, derive their authority in the premises? Certainly not from the Charter, nor directly from the people, for they made no appointment in the manner prescribed in the general election law.

In order to give validity to this election, it seems to me to be necessary to distort the obvious meaning of some of the words of the Charter, and entirely to expunge others, and sometimes substituting words not found in the instrument; thus the provision that the election shall take place at the general election, must be held, not merely to designate the *time* of the election, but the *place* and the *officers* by whom it is to be held, and the provision that the " Common Council shall call *all* city elections, designate the place of holding the same," &c., &c., must be held, to mean *not* ALL elections, but only particular elections, viz., special elections. To establish that an election ought to have taken place in September, 1851, it becomes necessary, in my opinion, to disregard the obvious meaning of the Charter, as expressed in sect. 1–5, art. 2, and 16, art. 4; and in order to establish that an election did take place, all the provisions of sect. 4, art. 2, must be kept out of view; and in order to establish the right of the relator to the office he claims, sect. 15, art. 4, must be disregarded, that section declaring " that any person

elected to a city office, who shall fail to qualify within ten days after his election, his office shall be deemed vacant." I can discover no authority or reason, thus to violate express and obvious provisions of the Charter, which regulates interests so important as those of this city, or defeats the action of those electors, who had at the preceding election legally appointed their own agents. For these reasons I dissent from the opinion of the court.